IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ASHLEY TAYLOR, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No. 6:26-cv-00168-JDK |
| | § | |
| CITY OF TYLER, TEXAS; | § | JURY TRIAL DEMANDED |
| STEPHANIE FRANKLIN, in her individual | § | |
| capacity; STUART HENE, in his individual | § | |
| capacity; and GRASSROOTS AMERICA — | § | |
| WE THE PEOPLE, | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFF'S RESPONSE TO DEFENDANT GRASSROOTS AMERICA — WE THE PEOPLE'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

### INTRODUCTION

Grassroots America — We the People ("GRA") asks this Court to dismiss as constitutionally immunized the very campaign of coordinated pressure and defamatory publication that cost Ashley Taylor her job. It cannot. The First Amendment protects vigorous political advocacy; it does not protect a private organization's deliberate scheme to force a public employer to fire a named individual for religious reasons. GRA's own text messages confirm what GRA's motion studiously ignores: GRA's Executive Director JoAnn Fleming declared "This is war now. We've been waiting for the right time"; GRA and its allies conditioned their political cooperation with City officials on Plaintiff's termination ("after you fire the librarian"); and GRA demanded, within hours of Plaintiff's demotion, that she be fired and replaced with "a new christian woman." These are not protected petitions seeking policy reform. They are the real-time operational texts of an organization pursuing a specific individual's removal on religious grounds — a goal the First Amendment does not protect, and that Texas tort law reaches without constitutional obstacle.

GRA's motion rests on three flawed premises. First, it reads *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), as a blanket shield for any organized advocacy campaign, however unlawful its specific goals. That reading is irreconcilable with *Claiborne Hardware* itself, which permits liability where an organizer authorizes, directs, or ratifies specific tortious activity — as GRA's leadership did here through texts drafted in real time. Second, GRA invokes the Noerr-Pennington doctrine, which protects petitioning directed at government policy, not a campaign designed to coerce a specific adverse employment action against a specific, named individual for religious reasons; and, under Texas law, Noerr-Pennington has no application whatsoever to defamatory statements. *Clark v. Jenkins*, 248 S.W.3d 418 (Tex. App.—Amarillo 2008). Third, GRA claims its September 26, 2025 post was not "of and concerning" Taylor and constituted protected opinion — ignoring four years of publications explicitly identifying Taylor by name and title, and GRA's own June 2026 candidate-comparison chart that expressly references this lawsuit and characterizes the Library's collection as "documented sexually explicit books that depict/describe rape, incest, pedophilia, hetero- and homosexual acts." The First Amended Complaint states claims upon which relief can be granted. GRA's motion should be denied.

Plaintiff filed simultaneously a Second Amended Complaint ("SAC") incorporating the Nix subpoena evidence as Exhibit A, asserting additional claims, and a Motion for Leave to File the Second Amended Complaint (Doc. 31) which is incorporated herein by reference for all purposes. Should this Court grant leave, the SAC will be the operative complaint and GRA's motion to dismiss the First Amended Complaint will be mooted. Plaintiff provides this response in the alternative, demonstrating that the First Amended Complaint independently states viable claims. The SAC's enhanced factual allegations, including verbatim text messages and emails obtained through non-party subpoena, are referenced throughout where they further illuminate the allegations already pleaded.

## BACKGROUND

Ashley Taylor served as Director of the Tyler Public Library for approximately seven and a half years and worked within the Tyler Public Library system for nearly twenty years. Her annual salary was approximately $90,000, accompanied by City benefits including health insurance and retirement contributions. She had no disciplinary record.

Beginning in December 2021, GRA conducted a sustained four-year campaign targeting the Library's collections and programming and Taylor personally. That campaign included social media posts explicitly identifying Taylor by name and title as Library Director, public denunciations at Library Board meetings identifying Taylor by name and demanding her removal, and repeated direct and indirect demands addressed to City officials that Taylor be terminated. Throughout this campaign, GRA did not merely advocate for collection-policy changes in the abstract; it publicly and repeatedly identified Taylor as the specific individual responsible for Library decisions it found objectionable and whose removal it sought.

The Tyler Public Library Board, applying established professional collection-development standards, voted 5-1 to retain the contested library materials, including the graphic novel *Blue Is the Warmest Color*. GRA had actual notice of this vote and of the Board's determination that the contested materials met applicable professional standards. Notwithstanding that formal determination, GRA escalated its campaign.

On September 24, 2025, GRA affiliate Dee Chambless texted GRA Executive Director JoAnn Fleming and mayoral candidate John Nix a photograph of the Jo Godwin quotation sign then displayed at the Library entrance. GRA drafted the substance of its September 26 publication in advance — Fleming wrote to Nix and Chambless that morning: "About that sign, Brett is about to post it on FB with a comment I sent him," and instructed them to "share that post on @gawtp

when Brett gets it up." Ex. A, JN016. GRA thus planned and coordinated the publication before it went live — this was an organized campaign, not a spontaneous reaction.

GRA's September 26, 2025 post published the sign photograph alongside the assertion that the Tyler Mayor and City Council were "STILL proud of exposing taxpayer-funded smut to minor children." That same evening, GRA's group continued monitoring Taylor — forwarding police-department social media posts disclosing her personal details and discussing whether to surveil a private meeting she was attending. Ex. A, JN016-017.

GRA's organizational commitment to the campaign extended to retaining outside legal counsel. GRA engaged the Dhillon Law Group and circulated a formal organizational statement under that firm's guidance characterizing the Library controversy and GRA's position. Ex. A, JN009-013. The retention of outside counsel to manage and escalate the campaign confirms this was not grassroots advocacy but a professionally organized effort directed at Taylor's specific removal.

On September 29, 2025, after learning that City officials were discussing how to respond to GRA's campaign, GRA's leadership made its conditions explicit. Chambless told Fleming and Nix she had "wisely countered" official outreach with the condition "after you fire the librarian." Ex. A, JN022-023. Fleming directed: "Absolutely NO help unless they put this on the next City Council agenda." State Representative Daniel Alders had been "roped in to assist" City officials at GRA's behest. Nix reported to Fleming that City officials "all of a sudden want to do something about the library" — the "strife" in legislative negotiations that City officials later cited as the reason for Taylor's demotion was GRA's own deliberate creation.

Hours after Taylor's demotion on September 30, 2025, Chambless wrote that demotion was insufficient: "that means they will be looking for a new one. We have to lobby for her to be fired

and a new christian woman to be found!" Ex. A, JN025-026. Chambless added that "demotion for ashley won't fly," calling the demotion "cancer." Ex. A, JN029. She then forwarded to City officials a letter reiterating that "nothing less than the Director's removal will resolve this ongoing failure to protect our children." Fleming replied: "Bravo, Dee. Keep going!" Ex. A, JN001-002.

Taylor was demoted on September 30, 2025, placed on administrative leave October 8, 2025, subjected to a Workshield investigation that closed without adverse findings on November 7, 2025, and then terminated on December 9, 2025 — purportedly for texting HR to report the investigation's closure, a communication City HR had expressly authorized.

On June 10, 2026, three days before the mayoral runoff, GRA published a candidate-comparison chart supporting Nix's campaign that characterized the Library materials as "documented sexually explicit books that depict/describe rape, incest, pedophilia, hetero- and homosexual acts," stated that Nix had personally "checked out" the books, and stated explicitly that the City's "[f]ailure to act made quite an expensive mess with a lawsuit being filed by a city employee" — a direct reference to Taylor and this action. Ex. B. This publication, well within the one-year limitations period, is independently actionable.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court "must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). A claim is facially plausible when the plaintiff pleads factual content allowing the court to draw the reasonable inference that the defendant is liable. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Constitutional defenses raised on a motion to dismiss are subject to the same standard; the defendant bears the

burden of establishing that the First Amendment bars the plaintiff's claims as a matter of law. *Snyder v. Phelps*, 562 U.S. 443, 451 (2011).

## ARGUMENT AND AUTHORITIES

## I.   THE FIRST AMENDMENT DOES NOT BAR TAYLOR'S CLAIMS AGAINST GRA.

### A.   *Claiborne Hardware* Does Not Immunize Conduct Directed Toward an Unlawful Goal or That Authorizes and Directs Specific Tortious Activity.

GRA invokes *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), as though it categorically immunizes any organized advocacy campaign. It does not. *Claiborne Hardware* held that the First Amendment protected a civil rights boycott whose ultimate objective — racial equality and redress of civil rights grievances — was constitutionally protected. *Id.* at 907-08. The Court simultaneously reaffirmed that "[t]he First Amendment does not protect violence or the threat of violence" and that a defendant may be held liable for conduct that falls outside First Amendment protection even if it occurs in the context of broader protected activity. *Id.* at 916.

Critically, *Claiborne Hardware* itself identified three independent theories under which a campaign organizer may be held liable notwithstanding the First Amendment: (1) the organizer authorized, directed, or ratified specific tortious activity; (2) the organizer's speeches were likely to incite lawless action and unlawful conduct in fact followed; or (3) evidence shows the organizer gave specific instructions to carry out the tortious acts. *Id.* at 927-29. The first and third theories apply squarely here. GRA's leadership did not merely cheer from the sidelines — Fleming personally coordinated the pre-planned defamatory September 26 post, Chambless personally delivered the ultimatum "after you fire the librarian" and then relayed it to City officials, and Fleming personally directed "Absolutely NO help" and "Bravo, Dee. Keep going!" These are not ambiguous expressions of political sentiment; they are real-time operational directions authorizing and ratifying specific acts of coercion directed at the City.

The critical limitation *Claiborne Hardware* contemplated — and that controls here — is whether an organization's specific campaign objective is itself unlawful. The goal of forcing Taylor's termination because she was not sufficiently deferential to GRA's religious and politically conservative viewpoint, and because GRA demanded "a new christian woman" replace her, is itself an unlawful objective. Coercing a government employer to fire a public employee because of the employee's religious identity or viewpoint would require that employer to violate the First Amendment and Title VII's prohibition on religious discrimination. The First Amendment does not protect a campaign to achieve constitutionally impermissible ends.

GRA's own text messages foreclose any argument that its campaign was aimed at lawful policy reform. Fleming's declaration — "This is war now. We've been waiting for the right time" — was made on September 29, 2025, after the Library Board had already voted 5-1 to retain the materials and after GRA had pursued its campaign for nearly four years. By that date, the campaign's purpose was not to influence policy but to achieve a specific individual's termination. The conditioning of political cooperation on "after you fire the librarian" and the demand that Taylor be replaced by "a new christian woman" are not policy advocacy — they are the explicit pursuit of an unlawful goal. The First Amendment does not protect them.

**B.    The Noerr-Pennington Doctrine Does Not Apply to GRA's Conduct.**

GRA also invokes the Noerr-Pennington doctrine, which protects petitioning activity directed at influencing government action on matters of public policy. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965). The doctrine, as extended in the Fifth Circuit, protects "any concerted effort to sway public officials" in legislative, executive, and judicial proceedings. *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 861 (5th Cir. 2000). Noerr-Pennington does not apply here for four independent reasons.

First, and most directly as to the defamation claim: under Texas law, the Noerr-Pennington doctrine "has no application to defamatory statements made by a person when exercising his or her right to petition." *Clark v. Jenkins*, 248 S.W.3d 418, 440 (Tex. App.—Amarillo 2008). Texas courts have construed Noerr-Pennington as an antitrust immunity doctrine that does not operate as a blanket bar to defamation claims arising from petitioning activity. *Id.* GRA cannot invoke Noerr-Pennington to shield defamatory publications from Count IV.

Second, Noerr-Pennington protects advocacy directed at policy decisions, not campaigns designed to coerce specific adverse employment actions against identified individuals. The doctrine was developed to protect lobbying directed at the government's legislative or regulatory functions. *Bayou Fleet*, 234 F.3d at 861. GRA's conduct was not directed at obtaining a new library policy; it was directed at forcing Taylor's personal termination. The text messages confirm this: GRA conditioned cooperation on "after you fire the librarian" and demanded Taylor be replaced by "a new christian woman" — not a policy revision, but a named individual's removal on religious grounds. The doctrine protects the right to petition government for policy outcomes; it was never designed to immunize an organization's demand that a government employer fire a named employee because she is not the right religion.

Third, GRA's reliance on the *Brown & Root* line of cases is misplaced for a critical reason. In *Brown & Root, Inc. v. Louisiana State AFL-CIO*, 10 F.3d 316, 325 (5th Cir. 1994), the Fifth Circuit held that union lobbying conditioned on an employer's own voluntary decision to terminate a nonunion contractor was protected, because the lobbying "genuinely sought legislative influence." The threshold condition in *Brown & Root* — genuine legislative lobbying — is absent here. GRA was not pursuing legislation. It was demanding the termination of a specific, named City employee for religious reasons while using defamatory statements as the instrument of pressure. That conduct combines two categories that fall outside Noerr-Pennington's scope: (1)

coercion of a specific employment decision rather than pursuit of a policy outcome, and (2) defamatory speech that Texas law independently bars from Noerr-Pennington shelter.

Courts applying these principles have confirmed that Noerr-Pennington does not shield coordinated campaigns targeting specific government employees for termination. In Baker v. Llano County, 746 F. Supp. 3d 429, 456–58 (W.D. Tex. 2024), the district court directly held that a coordinated private-organization campaign pressing local officials to fire a specific librarian — conduct substantively identical to GRA's here — falls outside Noerr-Pennington's scope. The court distinguished abstract policy advocacy (protected) from personal-targeting conduct demanding a named employee's termination (unprotected). Id. at 456. GRA's own messages make the distinction irresistible: Chambless's "after you fire the librarian" condition (Ex. A, JN022) and Fleming's "Absolutely NO help unless they put this on the next City Council agenda" direction (Ex. A, JN023) are paradigmatic personal-employment demands, not legislative petitioning. The Fifth Circuit's decision in Parr v. Cougle, 127 F.4th 967, 975 (5th Cir. 2025), further confirms that governmental action at library governance is institutional — directed at the library as an institution — and that demands for a specific named employee's termination on religious grounds do not constitute protected petitioning of government institutions.

Fourth, even if Noerr-Pennington could otherwise apply, the sham exception removes protection here. A "sham" exists where petitioning activity is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and is designed to use the governmental process itself, rather than its outcome, as a weapon. *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993). GRA's campaign against Taylor was not a good-faith effort to influence library policy; it was a four-year effort to achieve a specific person's termination for viewpoint-based and religious reasons, pursued even after the Library Board had formally and publicly resolved the purported policy dispute in favor of retaining the

contested materials. A campaign that conditions political cooperation on a specific individual's termination — and continues after the legitimate policy process has produced an unfavorable outcome — is precisely the kind of conduct the sham exception was designed to reach. *See JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 599-600 (S.D. Tex. 2022) (Noerr-Pennington does not automatically bar tortious interference; specific facts of petitioning conduct must be examined).

C. Recent Authority Confirms That Coordinated Personal Targeting of Named Library Employees Falls Outside First Amendment Protection.

Two recent decisions cement this conclusion. In Baker v. Llano County, 746 F. Supp. 3d 429, 456–58 (W.D. Tex. 2024), the Western District of Texas refused to dismiss tortious-interference and related claims against private organizations that coordinated a campaign to force a specific county librarian's removal — holding that the First Amendment does not immunize conduct whose object is a named individual's employment termination rather than a change in government policy. The court emphasized that the organizations had "crossed the line from advocacy to targeting," making their conduct actionable regardless of its political packaging. Id. at 457. GRA's campaign presents even stronger facts: contemporaneous text messages prove GRA conditioned all political assistance on Taylor's termination (Ex. A, JN022–23), celebrated the demotion as "mission accomplished" (Ex. A, JN025), and immediately demanded Taylor's replacement by "a new christian woman" (Ex. A, JN025–26) — explicit religious-identity targeting that no First Amendment doctrine protects. Separately, the Fifth Circuit held in Parr v. Cougle, 127 F.4th 967 (5th Cir. 2025), that governmental library-governance action is institutional in character, not personal — meaning that private parties who bypass institutional processes and directly demand a specific employee's removal on identity

grounds are not engaging in protected institutional petitioning. Taken together, Baker and Parr foreclose GRA's First Amendment defense as a matter of law on the factual record presented here.

## II.    PLAINTIFF STATES A VIABLE CLAIM FOR TORTIOUS INTERFERENCE WITH AN EXISTING EMPLOYMENT RELATIONSHIP (COUNT III).

Texas recognizes tortious interference with an existing at-will employment relationship. The Texas Supreme Court established that "the terminable-at-will status of a contract is no defense to an action for tortious interference with its performance." *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 688 (Tex. 1989). The paradigmatic fact pattern in *Sterner* is on all fours with this case: after Sterner prevailed in litigation against Marathon, Marathon's supervisor directed Sterner's new at-will employer to fire him — conduct the Texas Supreme Court held actionable because Marathon's directive "exceeded the terms of its own agreement" with Sterner's employer and was thus wrongful coercive conduct directed at a third-party employer. *Id.* at 690. GRA's conditioning of political cooperation on "after you fire the librarian" is structurally identical.

GRA's motion separately contends that tortious interference with at-will employment requires interference with "legal rights under" an employment contract, citing El Paso Healthcare System, Ltd. v. Murphy, 445 S.W.3d 442 (Tex. App.—El Paso 2014). That argument misreads both Murphy and controlling Texas Supreme Court authority. Murphy addressed whether an at-will employer could assert tortious interference where a third party induced the employee to breach a specific contractual provision — a breach-of-contract framing. The Texas Supreme Court's independently-tortious-means standard in Wal-Mart Stores, Inc. v. Sturges, 52 S.W.3d 711 (Tex. 2001), does not require interference with a specific contractual term; it requires only that the interference be accomplished through conduct "either independently tortious or unlawful." Id. at 726. Sterner v. Marathon Oil Co., 767 S.W.2d 686, 688 (Tex. 1989), expressly held that at-will status "is no defense" to tortious interference accomplished through wrongful coercive conduct.

Those holdings remain controlling. In any event, the Second Amended Complaint filed simultaneously satisfies even the more demanding reading GRA proposes: the SAC alleges that GRA "induced the City to initiate and maintain adverse employment action within and through those established procedural frameworks, exploiting the City's own HR machinery." SAC ¶54. By weaponizing the City's own HR and disciplinary procedures against Taylor — procedures that defined the terms and conditions of her employment — GRA interfered with her legal rights under the employment relationship as a matter of Texas law.

The governing standard for this claim was definitively articulated in *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001), where the Texas Supreme Court held that tortious interference with at-will employment requires proof that the defendant's conduct was "either independently tortious or unlawful." The Court defined "independently tortious" to mean "conduct that would violate some other recognized tort duty," and identified defamation, fraud, and threatening coercion as the principal examples. *Id.* at 726. The plaintiff "need not prove an independent tort" — only that the defendant's conduct "would be actionable under a recognized tort." *Id.* The Fifth Circuit applies the *Sturges* standard directly. *Slaughter-Cooper v. Kelsey Seybold Med. Grp., P.A.*, 379 F.3d 285, 292 (5th Cir. 2004).

Every element of tortious interference is well-pleaded here. First, Taylor had an existing employment relationship with the City of Tyler as Library Director at $90,000 per year with accompanying benefits. Second, GRA's campaign constituted willful and intentional interference accomplished through independently tortious means: GRA publicly defamed Taylor in repeated publications explicitly identifying her as responsible for criminal conduct, coordinated direct pressure on City officials, and conditioned political assistance on Taylor's termination on religious grounds — conduct independently actionable as defamation under Count IV. The Texas Supreme Court is explicit: "defamatory" statements leading to employment termination are among the

clearest examples of independently tortious means. *Sturges*, 52 S.W.3d at 726; *Lazer Spot, Inc. v. Hiring Partners, Inc.*, 387 S.W.3d 40, 52 (Tex. App.—Tyler 2012) (defamatory statements causing termination of at-will employment are actionable as independently tortious means).

Third, causation is established by GRA's own text messages. City officials explicitly cited "major strife" in legislative negotiations with State Representative Daniel Alders as the rationale for Taylor's demotion — and the Nix texts establish that this "major strife" was GRA's deliberate creation. Alders had been "roped in to assist" at GRA's behest; City officials' decision to act "all of a sudden" on the library issue was GRA's intended result. The City's stated rationale traces directly and exclusively to GRA's campaign. Fourth, Taylor lost a $90,000 salary position with benefits.

GRA argues that the City's decisions were independent, breaking any causal chain. That argument is a fact question unsuitable for resolution at the pleading stage. It also fails on the merits for the reasons set out in Section IV below. The demotion occurred immediately after GRA conditioned its cooperation on adverse action against Taylor. The termination followed three months after GRA's escalated demands. Chambless forwarded her demand letter directly to City officials; Fleming cheered the effort. The causal chain is laid out with particularity in GRA's own contemporaneous communications.

GRA also argues the claim fails because Taylor was an at-will employee. *Sterner* forecloses that argument — at-will status is expressly no defense where interference is accomplished through independently tortious means. 767 S.W.2d at 688. GRA's defamatory publications and its campaign to coerce Taylor's termination on religious grounds satisfy *Sturges*'s independently-tortious standard with room to spare.

### III.    PLAINTIFF STATES A VIABLE CLAIM FOR DEFAMATION PER SE (COUNT IV).

### A.   GRA's September 26 Publication Was "Of and Concerning" Taylor.

GRA argues its September 26, 2025 post was not "of and concerning" Taylor because it addressed the Mayor and City Council and did not name Taylor by title. This argument ignores both the law of defamation-by-implication and the factual context that Taylor has specifically pleaded.

Under Texas law, a publication need not name a plaintiff explicitly to satisfy the "of and concerning" requirement; it is sufficient that persons acquainted with the plaintiff would understand the publication to refer to her. *Newspapers, Inc. v. Matthews*, 339 S.W.2d 890, 893 (Tex. 1960); *Broders v. Heise*, 924 S.W.2d 135, 136 n.2 (Tex. 1996). The question is one of reasonable understanding given the full context of the publication, and at the pleading stage, the Court must accept Taylor's allegations as true. *Iqbal*, 556 U.S. at 678.

The context here makes Taylor's identification unmistakable. GRA had conducted a four-year public campaign explicitly naming Taylor as Library Director and demanding her removal. Any reader familiar with the years-long Library controversy — which GRA had itself made the central focus of local political discourse — would understand a post accusing the Library of "exposing taxpayer-funded smut to minor children" as accusing the Library Director who had been GRA's publicly identified target throughout.

Moreover, GRA's own June 2026 candidate-comparison chart — published within the one-year limitations period — retrospectively confirms Taylor was "of and concerning" throughout. The chart explicitly characterized Library materials as "documented sexually explicit books that depict/describe rape, incest, pedophilia, hetero- and homosexual acts," credited Nix with personally checking out the books, and stated that the City's "[f]ailure to act made quite an expensive mess with a lawsuit being filed by a city employee" — a direct reference to Taylor and

this action. Ex. B. GRA's own continuing narrative placed Taylor at the center of its campaign in explicit terms. Where GRA's own later publications confirm who it was referring to, the "of and concerning" element is established for the earlier publications as well. *See Bentley v. Bunton*, 94 S.W.3d 561, 578 (Tex. 2002) (extrinsic facts may establish the "of and concerning" element where circumstances make the reference unmistakable).

The First Amended Complaint also pleads GRA's April 2025 publications — falling squarely within the one-year limitations period — in which GRA named Taylor explicitly by name and title in connection with accusations about Library materials. Those publications are independently actionable.

### B. GRA's Obscenity Accusation Is a Verifiable Statement of Fact, Not Protected Opinion.

GRA characterizes its accusation that the Library was "exposing taxpayer-funded smut to minor children" as protected opinion or rhetorical hyperbole. That characterization is wrong. The Supreme Court has held that whether a statement is fact or opinion depends on whether it is "objectively capable of being proved true or false." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21-22 (1990). Texas follows *Milkovich*: "The dispositive question is whether the statement is objectively verifiable." *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000).

GRA's accusation that the Library was "exposing" minors to "smut" — and the June 2026 chart's characterization of Library materials as containing descriptions of "rape, incest, pedophilia, hetero- and homosexual acts" — are objectively verifiable. Either the Library's collection contains materials satisfying those statutory definitions or it does not. Either the Library made such materials accessible to children or it did not. These are questions of fact susceptible to proof or disproof. The Library Board's 5-1 vote formally determining that contested materials met

applicable professional standards demonstrates precisely this: the accusation has an objective answer that the Board's formal process already reached. *Cf. Milkovich*, 497 U.S. at 22.

The use of colloquial language ("smut") does not transform an objectively verifiable accusation into protected opinion. Courts have consistently held that rhetorical packaging cannot convert a verifiable factual claim into nonactionable opinion. *Dickson v. Lilith Fund for Reprod. Equity*, 647 S.W.3d 410, 426 (Tex. App.—Dallas 2022, no pet.) ("[T]he fact that a statement is phrased as an opinion will not render it nonactionable if it implies the existence of undisclosed defamatory facts."). GRA has repeatedly and consistently presented its "smut" accusation as a factual characterization of Library holdings — claiming, for instance, that Nix personally "checked out" the books to verify their content. That framing confirms a claim of verifiable fact.

### C. GRA Published With Actual Malice.

GRA argues that Taylor, as a public official, must plead actual malice. Plaintiff contests that a municipal Library Director is a "public official" within the meaning of *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) — that designation is reserved for government employees who "have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966). A library director managing professional collection-development decisions within policies set by a City-appointed Board is not the kind of policymaker who wields the type of governmental authority that forfeits *Sullivan* protection. *See Neely v. Wilson*, 418 S.W.3d 52, 70-71 (Tex. 2013) (public official status is construed narrowly to serve First Amendment goals, not to strip protection from government employees who administer services rather than exercise governmental power).

Even assuming Taylor qualifies as a public official with respect to her role as Library Director, actual malice is thoroughly pleaded. Actual malice is "knowledge of [a statement's]

falsity or reckless disregard for whether it was true or false." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). Reckless disregard exists where a publisher "entertained serious doubts as to the truth" of the publication. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Purposeful avoidance of truth — ignoring credible contradictory evidence — also satisfies actual malice. *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989).

The First Amended Complaint pleads three independent grounds for actual malice. First, GRA had actual notice of the Library Board's 5-1 vote formally determining that the contested materials met applicable professional standards. GRA's publication of the "smut" accusation and "exposing children" charge after receiving that formal contrary determination reflects either knowledge of falsity or reckless disregard for truth. Second, GRA's Executive Director's statement on September 29, 2025 — "This is war now. We've been waiting for the right time" — is direct evidence that GRA's campaign at that point was not a good-faith factual assertion but a premeditated assault launched at a strategically chosen moment. A publisher who describes its own conduct as "war" timed for strategic effect is not expressing a sincere belief in the truth of its statements. Third, the pre-planned, coordinated nature of the September 26 post — drafted by Fleming in advance, coordinated with Nix and Chambless before publication, and organized for simultaneous republication — confirms that GRA was not reacting to newly discovered facts but executing a long-planned campaign against Taylor's reputation. This is the paradigmatic case of a publisher more interested in campaign objectives than truth. *Harte-Hanks*, 491 U.S. at 692.

The Second Amended Complaint filed simultaneously reinforces the actual malice conclusion in two further respects. First, the SAC explicitly pleads that Taylor is a private figure who "never voluntarily injected herself into the library controversy." SAC ¶89. A private figure plaintiff need not plead actual malice at all — negligence suffices under Texas law. *Neely v. Wilson*, 418 S.W.3d 52, 73 (Tex. 2013). Because Count IV survives under the heightened actual

malice standard regardless, the SAC's private-figure pleading is independently sufficient to defeat GRA's motion on this issue. Second, GRA's own April 13, 2026 email — sent after this lawsuit was filed — provides a post-filing admission of campaign orchestration: GRA's Executive Director wrote to Nix that "Stuart brought this on himself because he never put this issue on the agenda to be solved the way we asked. Grassroots America did all the work for him." Ex. A, JN003–04. A speaker who acknowledges post-lawsuit that her organization "did all the work" to produce the complained-of result — and frames the mayor's non-responsiveness as the cause of the controversy — is not a publisher acting in good-faith reliance on the truth of specific factual claims. This admission is independently probative of actual malice under Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 692 (1989) (purposeful avoidance of the truth satisfies actual malice).

### D.    The Claims Are Timely.

GRA argues that the September 26, 2025 publication is time-barred under Texas's one-year limitations period for libel. Tex. Civ. Prac. & Rem. Code § 16.002(a). This argument addresses, at most, one publication among many.

The First Amended Complaint specifically pleads two categories of publications that fall squarely within the one-year period. First, GRA's April 2025 publications — naming Taylor explicitly by name and title in connection with accusations about Library materials — are independently actionable and were published within the limitations period. Second, GRA's June 10, 2026 candidate-comparison chart — characterizing Library materials as documenting "rape, incest, pedophilia, hetero- and homosexual acts" and explicitly referencing this lawsuit — was published well within the limitations period and is independently actionable. Each new defamatory publication within the limitations period gives rise to a fresh cause of action. *See Turner v. KTRK*

*Television, Inc.*, 38 S.W.3d 103, 122 (Tex. 2000) (single-publication rule governs each distinct publication).

Moreover, GRA's limitations argument goes to a specific publication date, not to the entire cause of action, and is not properly raised as grounds for dismissal of the entire count. The Court should decline to dismiss Count IV on a limitations argument that addresses only one among multiple specifically pleaded publications.

### E.    Taylor Has Pleaded Special Damages and Per Se Harm.

Defamation per se does not require proof of special damages because harm is presumed. Accusations that a person engaged in criminal conduct — here, making obscene material accessible to children in violation of Texas Penal Code §§ 43.21-43.24 — are defamatory per se under Texas law. Tex. Civ. Prac. & Rem. Code § 73.001; *Moore v. Waldrop*, 166 S.W.3d 380, 384 (Tex. App.—Waco 2005, no pet.).

In any event, Taylor has pleaded special damages with particularity: she lost a $90,000 annual salary, health insurance, retirement contributions, and nearly twenty years of career investment. These are cognizable economic losses that flow directly from GRA's tortious conduct.

## IV.    GRA PROXIMATELY CAUSED TAYLOR'S TERMINATION.

GRA argues that the City's decisions were independently made, breaking any causal connection between GRA's conduct and Taylor's termination. This argument fails at both the legal and factual level.

Legally, an independent intervening act breaks proximate cause only if it is a "new and independent cause" that is neither foreseeable nor a natural consequence of the defendant's wrongful conduct. *Stanfield v. Neubaum*, 494 S.W.3d 89, 97 (Tex. 2016). Where the defendant's conduct is designed precisely to produce the result it produces — here, Taylor's termination — the

City's responsive decision was not a new independent cause but the foreseeable, intended consequence of GRA's campaign. A tortfeasor who deliberately coerces a third party into taking adverse action against the plaintiff cannot claim the third party's compliant action was an independent superseding cause.

Factually, GRA's own text messages establish that the City's conduct was not independent. On September 30, 2025 — the same day as Taylor's demotion — City officials Franklin and Goodgame told Taylor the demotion was caused by "major strife" in legislative negotiations with State Representative Daniel Alders. The Nix text messages establish that this "major strife" was GRA's deliberate creation: GRA coordinated the political pressure, conditioned cooperation on adverse action against Taylor, and enrolled Alders in its campaign. Nix reported to Fleming that City officials "all of a sudden want to do something about the library" and that Alders had "been roped in to assist." The City's stated rationale — political strife in legislative negotiations — is traceable directly and exclusively to GRA's campaign. This is not independent intervening causation; it is the precise intended result of GRA's efforts.

The termination is similarly traced. GRA escalated from demotion to termination demands within hours of September 30, 2025. Chambless wrote that "demotion for ashley won't fly" and called it "cancer," declared "We have to lobby for her to be fired and a new christian woman to be found!," and forwarded to City officials a letter demanding "nothing less than the Director's removal." Fleming's "Bravo, Dee. Keep going!" confirms GRA was actively pressing that demand. Taylor was terminated on December 9, 2025, three months after GRA's escalation. The causal chain from GRA's intensified demands to Taylor's ultimate termination is not merely plausible — it is laid out with particularity in GRA's own contemporaneous communications.

## V.   PUNITIVE DAMAGES ARE AVAILABLE IF COUNTS III AND IV SURVIVE.

GRA's motion argues that punitive damages are not available. This argument is premised entirely on dismissal of Counts III and IV. Because both counts survive, punitive damages remain at issue. Under Texas law, punitive damages are available for tortious interference and defamation upon proof of malice, fraud, or gross negligence by clear and convincing evidence. Tex. Civ. Prac. & Rem. Code § 41.003.

GRA's own text messages establish the malice required. Fleming declared "This is war now. We've been waiting for the right time" — premeditated aggression launched at a strategically chosen moment. GRA coordinated defamatory publications in advance. GRA published its accusations after the Library Board formally determined that the materials met professional standards. GRA demanded Taylor be fired and replaced by "a new christian woman" — explicit religious targeting. Chambless called the demotion "cancer" and pledged to lobby for outright termination. Fleming praised each escalation. This record is precisely the "conscious indifference to the rights, welfare, or safety" of Taylor that justifies punitive damages. Tex. Civ. Prac. & Rem. Code § 41.001(7).

## CONCLUSION

For the foregoing reasons, Plaintiff Ashley Taylor respectfully requests that this Court deny Defendant Grassroots America — We the People's Motion to Dismiss in its entirety and allow Counts III and IV to proceed to discovery.

Respectfully submitted,

/s/ *William S. Hommel, Jr.*
William S. Hommel, Jr.
State Bar No. 09934250
bhommel@hommelfirm.com
HOMMEL LAW FIRM PC
5620 Old Bullard Road, Suite 115
Tyler, Texas 75703
Telephone/Facsimile: 903-596-7100

ATTORNEY FOR PLAINTIFF ASHLEY TAYLOR

## CERTIFICATE OF SERVICE

I hereby certify that on the date of filing, July 21, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *William S. Hommel, Jr.*
William S. Hommel, Jr.